# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Arlander Keys | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 1749 | **DATE** | 12/20/2001 |
| **CASE TITLE** | Frank Seban vs. Larry Massanari | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____ . Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Memorandum Opinion and Order entered. Commissioner's Motion for Summary Judgment [#21] is hereby granted; Plaintiff's Motion for Summary Judgment [#16] is hereby denied. *AK*

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 2 | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | DEC 2 1 2001 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | 12/20/2001 | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| FT/ *secy* courtroom deputy's initials | | | FT mailing deputy initials | |

FILED FOR DOCKETING
01 DEC 20 AM10: 50

Date/time received in central Clerk's Office

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

FRANK SEBAN,                        )
                                    )
            Plaintiff,              )    No. 01 C 1749
                                    )
       vs.                          )    Arlandger Keys
                                    )    Magistrate Judge
LARRY G. MASSANARI[1]               )
Acting Commissioner of Social       )
Security,                           )
                                    )
            Defendant.              )

## MEMORANDUM OPINION AND ORDER

**DOCKETED**

**DEC 2 1 2001**

This matter is before the Court on Plaintiff Frank Seban's
motion for summary judgment pursuant to Rule 56(a) of the Federal
Rules of Civil Procedure, to reverse the decision of the
Commissioner of Social Security ("Commissioner"), which found
that Plaintiff's medical condition had improved and that he was
no longer disabled.  In the alternative, Plaintiff moves that
this case be remanded to the Commissioner for further
proceedings.  The Commissioner has filed a cross-motion for
summary judgment.  For the reasons set forth below, the Court
grants the Commissioner's Motion, and denies Plaintiff's Motion.

### PROCEDURAL HISTORY

Plaintiff applied for Title XVI Supplemental Security Income
(SSI) benefits on January 22, 1993.  Plaintiff alleged disability

---

[1] On April 3, 2001, Mr. Massanari became Acting Commissioner
of Social Security.  Mr. Massanari is automatically substituted
for William Halter as the Defendant in this civil action.  Fed.
R. Civ. P. 25(d)(1); 42 U.S.C. § 405(g).

due to cancer of the neck and tongue. Plaintiff's SSI application was denied on March 30, 1993. (R. at 61-64.) On September 22, 1993, Plaintiff filed a second SSI application, again claiming disability due to cancer of the neck and tongue. The second application was granted, finding Plaintiff disabled due to squamous cell carcinoma of the posterior tongue as of September 1, 1993. (R. at 84.)

On January 8, 1998, the Commissioner informed Plaintiff that his SSI benefits would be terminated. (R. at 128-30.) Plaintiff claimed that he was still disabled and requested reconsideration. (R. at 131-41; 151-58.) On August 10, 1999 the Social Security Administration ("SSA") affirmed the termination of Plaintiff's SSI benefits. (R. at 222-37.) Plaintiff requested and received a hearing before ALJ Stephen J. McGuire.

In a decision dated February 24, 2000, the ALJ determined that Plaintiff was no longer disabled as of January 1998. (R. at 12-21.) On January 12, 2001, the Appeals Council denied Plaintiff's request for review, making the ALJ's determination the Commissioner's final decision. (R. at 6-7.)

### STATEMENT OF FACTS

#### A. Evidence at Hearing

The evidence presented at Plaintiff's hearing included the Plaintiff's testimony, the testimony of vocational expert Grace

2

Gianforte, and Plaintiff's medical records.  The Court will
discuss the evidence in turn.

### 1.  Plaintiff's Testimony

Plaintiff was born on June 5, 1948.  (R. at 28.)  Even
though he attended college for seven years, he attained only a
sophomore standing.  (R. at 29.)

On July 10, 1978, Plaintiff injured his left hand by
striking it against a valve, while working as a laborer for Dreis
& Krump.  (R. at 245.)  He subsequently developed arthritis in
his wrist and underwent a surgical procedure in the late 1970's.
(R. at 41.)  However, the medical records documenting this
surgery were not included in the record.

In 1985, Plaintiff took a job as a water pipe cleaner with
Pipesavers Inc.  (R. at 30-31.)  The position required Plaintiff
to insert into the pipe a mechanical device, which cleaned the
pipe with water pressure, and to close the pipe.  (R. at 31.)  In
addition to cleaning pipes, Plaintiff moved tools and maintained
equipment.  (R. at 31.)  These tasks sometimes required Plaintiff
to lift a chain around the pipe that weighed approximately 150 to
175 pounds.  (R. at 31-32.)

From 1986 to 1988, Plaintiff worked for Union Liquor
Consolidated Distilled Products as a delivery truck helper.  (R.
at 30.)  Plaintiff delivered alcohol to wholesalers and
retailers, which required repeated lifting.  (R. at 32.)

3

Plaintiff manually loaded stock from a conveyor to his truck, and delivered between 50 to 60 pounds of stock from the truck to his customers. (R. at 32-33.) Plaintiff claims that pain in his left hand, caused by his previous injury, contributed to his decision to leave this job in January, 1988. (R. at 33, 69.) Plaintiff has not worked since then. (R. at 33.)

Plaintiff underwent a second surgical procedure on his left wrist in the 1990's, but this report is not in the record. Plaintiff testified that he had the surgery because of arthritis and pain in his left hand. (R. at 41.) Plaintiff explained that his last x-ray revealed that the three carpal bones that are still in his wrist are right up against the styloid. (R. at 41.) He expressed concern that, if he uses or overuses his hand, his left wrist will become more arthritic. (R. at 41.)

In November, 1992, Plaintiff was diagnosed with oral squamous cell carcinoma (cancer) of the posterior base of the tongue. (R. at 92.) Plaintiff underwent surgery for the cancer in December 1992 at the University of Illinois at Chicago Hospital ("UIC"). (R. at 35-36.) The surgery involved a wide local excision of the right base of the tongue and a right supraomohyoid neck dissection. (R. at 92, 97-98.) As a result of the surgery, Plaintiff had reduced upper body and upper arm strength. (R. at 119.)

4

Plaintiff visited the UIC Eye and Ear Infirmary ("EEI")
every six months for follow-up treatment after the cancer
surgery.  Plaintiff's visits began in December 1992 and continued
until January 1998, when his Medicaid ceased.  (R. at 33-34; 86-
95; 128-130.)  Plaintiff claims that, since his Medicaid ceased,
he has been unable to afford medical care.  (R. at 34; 41-42.)
Some of the doctors at the EEI recommended regular six month
visits to determine if the cancer will return.  (R. at 41.)  As
of the date of the hearing, Plaintiff was in full remission and
was not taking any medication.  (R. at 35-36.)

Plaintiff claims that physical exertion causes sharp
arthritic pain in his left hand, which prevents him from working.
(R. at 34.)  As a result of the cancer surgery, which included a
neck dissection, Plaintiff has reduced upper body and upper arm
strength.  (R. at 119.)  While Plaintiff admits that he does not
have pain in his neck and shoulder from the cancer surgery, he
claims that he becomes disoriented after a certain level of
exertion.  (R. at 34.)

Plaintiff admitted that he is able to cook, wash dishes,
sweep and mop the floor, vacuum, do laundry, grocery shop, make
beds, and use public transportation.  (R. at 36-37.)  He
occasionally goes to the movies and tries to keep the house in
good shape.  (R. at 37.)  He does maintenance, painting, and lawn
work at his house and his mother's cottage.  (R. at 37.) On a

5

typical day, Plaintiff does chores around the house and shops for groceries.  Plaintiff testified that after he does these chores, he usually finds himself disoriented.  (R. at 37-38.)  However, he has not discussed the disorientation he feels after exertion with a doctor.  (R. at 35.)  Plaintiff stated that a typical day usually involves chores around the house, which could include, going to get groceries, polishing cabinets, vacuuming or washing windows.  (R. at 39.)

Plaintiff can comfortably stand for about 40 minutes, but experiences back pain if he stands for longer periods.  (R. at 39-40.)  He admitted that he can walk for approximately one mile, he can lift and carry 20 to 30 pounds for approximately 25 feet, and that his right arm is stronger than his left arm.  (R. at 40.)  Plaintiff does not have any trouble manipulating his fingers.  (R. at 40.)

In an attempt to summarize Plaintiff's testimony, the ALJ asked Plaintiff if he could occasionally lift 50 pounds, frequently lift 25 pounds, stand or walk for six hours in an eight hour day, sit for six hours in an eight hours day and push and pull 50 pounds.  (R. at 45-46.)  Plaintiff agreed that this was an accurate description of his abilities.  (R. at 46.)

### 2.  Testimony of Vocational Expert, Grace Gianforte

Grace Gianforte is a licensed certified counselor.  (R. at 42.)  She has been in private practice since 1978.  (R. at 42.)

Prior to 1978, Ms Gianforte was the director of Counseling Services at the Goodwill Rehabilitation Center. (R. at 42.) Ms. Gianforte also worked for nine and a half years at the Illinois State Psychiatric Institute. (R. at 42.)

At the hearing, Ms. Gianforte testified that Plaintiff's skill and exertional level as a delivery truck helper was unskilled and heavy in exertion, requiring frequent lifting of between 20 to 75 pounds. (R. at 44-45.) Ms. Gianforte testified that Plaintiff's job as a water pipe cleaner was a semi-skilled job, since it involved the use of tools, equipment, and machinery, and that it was also a heavy exertional position. (R. at 45.) She testified that an individual of Plaintiff's age, education, and vocational background; who can lift 50 pounds occasionally, and 25 pounds frequently; who can stand or walk for six hours in an eight hour day; who can sit for six hours in an eight hour day; and whose pushing or pulling would be limited to 50 pounds, would not be able to work in Plaintiff's previous jobs because they involved lifting, pushing, and pulling more than 50 pounds. (R. at 45-46.)

### 3. Medical Records

On July 10, 1978 Plaintiff injured his left hand by striking it against a valve. (R. at 245.) Plaintiff sustained a fracture of his left scaphoid (wrist bone), which required surgery. (R. at 94, 149, 152-153, 138.) He underwent two

7

surgical procedures, one in the 1970's and the second in 1993, but these reports are not in the Record. Plaintiff received occupational therapy after the second surgery to his hand from June, 1993 until February, 1994. (R. at 153.)

In November, 1992, Plaintiff was diagnosed with oral squamous cell carcinoma (cancer) of the posterior base of the tongue, which required a wide local excision of the right base of the tongue lesion and a right supraomohyoid neck dissection. (R. at 92, 97-98.) This surgery was performed at the UIC Hospital on December 7, 1992. (R. at 97.) After surgery, his range of motion was limited because of the neck dissection. The cancer did not reoccur. (R. at 112-13, 117, 119, 169.)

On February 4, 1993, Dr. Theodore P. Mason, of the Ear, Nose and Throat Clinic ("ENT") in the Department of Otolaryngology at UIC, completed a report for the Illinois Department of Public Aid regarding Plaintiff's capacity for physical activity. (R. at 114-118.) Dr. Mason indicated that Plaintiff was limited to lifting up to 10 pounds, and reported a 10 - 20 % reduced capacity for activities of daily living. However, Plaintiff had full capacity for standing, walking, sitting, bending, turning, speaking, finger dexterity, fine manipulations and gross manipulations. (R. at 118.) Dr. Mason had been treating Plaintiff on a monthly basis from October 21, 1992 through the

date of the report (February 4, 1993) for the squamous cell carcinoma of the base of the tongue. (R. at 115.)

In a letter dated March 5, 1993, Dr. Petchenik, from UIC's ENT, stated that Plaintiff was being treated at the clinic, but that it was too soon after surgery to determine the tumor status. (R. at 119.) However, he noted that because of the neck dissection, Plaintiff's upper body and upper arm strength and dexterity were affected, so that he was limited in his ability to perform activities requiring the use of these muscles, such as lifting, pushing, pulling, and carrying. (R. at 119.)

On January 30, 1997, progress notes from ENT show that Plaintiff complained of shoulder stiffness and tightness with physical exertion. (R. at 175.) Dr. Mason noted that Plaintiff's shoulder was negative for apparent cranial nerve dysfunction. (R. at 175.) On May 22, 1997, Plaintiff complained again of right shoulder stiffness with physical activity. (R. at 173.) On October 28, 1997, Plaintiff complained of persistent shoulder stiffness and the doctor recommended physical therapy. (R. at 174.)

On November 11, 1997, Dr. Mason completed a neoplasm report for SSA in which the doctor noted that Plaintiff's cancer was under control. (R. at 178.) However, Dr. Mason opined that, because of the neck dissection, Plaintiff had permanent loss of strength of the musculature of the upper body, upper arms, and

shoulder and that Plaintiff's ability to push, pull, lift and carry was limited.  (R. at 178.)

On December 2, 1997, Dr. Benjamin Toh examined Plaintiff at the request of the SSA.  (R. at 179-184.)  Plaintiff claimed to have had two operations on his left hand and complained that activities requiring dexterity caused pain in this hand.  (R. at 179-80.)  However, Plaintiff had difficulty describing what activities he could and could not do with his left hand.  (R. at 179-80.)  Dr. Toh noted that Plaintiff had full range of motion in all joints, normal grip strength, and normal dexterity.  (R. at 181.)  His impression of Plaintiff's left hand problem was "[s]tatus post two operations on his left hand.  The first was in the late 1970's.  The second was in the 1990's.  Both his hands have normal grip strength and dexterity.  There is no atrophy of his left upper extremity."  (R. at 182.)  Dr. Toh also believed that Plaintiff's cancer was in apparent remission.  (R. at 182.)

On July 7, 1998, progress notes show Plaintiff complained of intermittent right neck paresthesia when he slept on that side, and of not feeling "sharp" when he gets up in the morning or after activity involving his right shoulder.  (R. at 171.)

On August 20, 1998, Dr. Mason completed a neoplasm report and medical questionnaire for the Bureau of Disability Determination Services, which noted that, because of the neck surgery, Plaintiff has permanent loss of strength of the

10

musculature of the upper body, upper arm, and shoulders and is unable to perform activities requiring use of the muscles in these areas, such as, pushing, pulling, lifting, and carrying. (R. at 194-196.)

On November 5, 1999, Dr. Mason reported that Plaintiff had no evidence of cancer or tumor, but that because of the neck dissection, Plaintiff's upper body, shoulders and upper arm strength and dexterity was greatly reduced and Plaintiff was "unable to perform activities which require use of muscles in these areas, such as, lifting, pushing, pulling, carrying." (R. at 169.)

### 4. Other Records

In a disability report dated January 22, 1993, Plaintiff stated that aftercare for neck and tongue surgery for malignant cancer was disabling. (R. at 65-72.) He stated that the surgery was recent, that aftercare was required on a regular basis, and that he could not work because the right side of his head was numb. (R. at 65-72.)

On August 22, 1997, Plaintiff filled out a report of continuing disability and was interviewed. Plaintiff stated that his disabling condition was proximal row carpectemy-excision of scaphoid of left wrist, wide resection of right base of tongue lesion and suprahyoid lymphadenectomy (neck dissection). (R. at 132.) In this report, he stated that he experiences soreness,

11

stiffness, and cramping of the right side of his neck and right
shoulder and pain in his left wrist. (R. at 132.)

On October 1, 1997, Plaintiff filed a second disability
report, claiming that pain in his left hand, left wrist, and
right shoulder, right side of his neck, around his jaw and
stiffness rendered him disabled. (R. at 142.) Then, on January
26, 1998, Plaintiff filed a Request for Reconsideration of
Disability Cessation, stating that he was still disabled and
unable to return to work because of diminished capacity of his
left wrist and arm and right side of neck, right shoulder, and
back. (R. at 131, 151.)

On July 25, 1998, Plaintiff filled out a pain questionnaire
and an activities of daily living questionnaire. (R. at 159-
164.) In the questionnaire, Plaintiff stated that he has pain in
his left wrist, right shoulder, right side of his neck, and right
side of his jaw. (R. at 159.) He stated that the pain sometimes
spreads to the left front of his chest with both light and heavy
exertion. (R. at 159.) Typically, the pain lasts from two or
three hours to two days. (R. at 159.) Plaintiff does not take
prescription medication for the pain, but sometimes takes
aspirin, which sometimes relieves the pain, but usually does not.
(R. at 159.) Plaintiff stated that the household chores he
performs include cleaning, vacuuming, laundry, repairs, yard work
and weekly grocery shopping. (R. at 161.) He states that the

chores have become more difficult and painful, and he takes aspirin for the pain. (R. at 161.)

On July 21, 1999, Plaintiff was interviewed by Sarita Varma, a disability officer with the SSA. (R. at 211-221.) In this interview, Plaintiff stated that, whenever he does strenuous activities or heavy lifting, he has discomfort and becomes disoriented. (R. at 213.) He stated that he can lift up to 40 pounds, but then becomes tired and disoriented and it sometimes takes one to two days to recover. (R. at 213.) He further stated that, "sometimes I can do the normal chores and I won't have the aftermath. But then at other times it will take me 2 days to recover. I can't predict it." (R. at 213.) In this report, Ms. Varma noted that Plaintiff appeared to be nervous during the interview and he seemed to be depressed about his condition. (R. at 220.)

**B. ALJ's Opinion**

On February 24, 2000, the ALJ issued his decision, finding that Plaintiff was no longer disabled as of January, 1998. (R. at 20.) In making his decision, the ALJ reviewed the entire record, which included Plaintiff's testimony at the hearing and the 40 exhibits that were admitted into evidence. (R. at 15.) Since the Plaintiff had not worked since the established onset date of disability, September 1, 1993, the ALJ found that he was not engaged in substantial gainful activity. (R. at 16.)

13

As of September 1, 1993, Plaintiff was found to be disabled because his squamous cell carcinoma of the posterior tongue was so severe that it met the criteria of Listing 13.02E. (R. at 16.) The ALJ noted that, after this surgery, the medical evidence fails to show a recurrence of the cancer. (R. at 16-17.) In fact, Plaintiff testified that the cancer had not returned since 1992. (R. at 16.) The November 5, 1999 report of Dr. Mason confirmed that there was no evidence of tumor present on his last examination. (R. at 17.) Relying on this report, the ALJ found that Plaintiff no longer has cancer, that his impairment no longer meets the criteria of Listing 13.02E, and, therefore, medical improvement had occurred. (R. at 17.) Further, in relying on Social Security Regulation 416.994[2], the ALJ found medical improvement related to the ability to work had occurred. (R. at 17.)

The ALJ found that, even though Plaintiff does not have an impairment of Listing-level severity, he still has a severe impairment which imposes more than a minimal limitation on his ability to work. (R. at 17.) The ALJ noted that the reports of Dr. Lon Petchnik, dated March 5, 1993, and Dr. Theodore Mason, dated November 11, 1997 and November 5, 1999, all concluded that

---

[2] SSR 416.994 states that if medical improvement has occurred and the impairment no longer meets the requirements of the Listing of Impairments, the medical improvement will be found to be related to the ability to work.

14

the Plaintiff has reduced strength and dexterity in his upper body and arms, which impacts his ability to lift, carry, push, or pull. (R. at 17.)

The ALJ then compared the Doctors' reports, noting an inconsistency between Dr. Mason's November, 1997 report and November, 1999 reports. Dr. Mason's November, 1999 report stated that Plaintiff was unable to perform activities which require use of the muscles of his upper body, shoulder and upper arms; whereas Dr. Mason's November, 1997 report and the 1993 report of Dr. Petchnik stated that Plaintiff was limited in his abilities, but not precluded. (R. at 17.) Notably, Dr. Mason did not provide a medical explanation for why he placed a more restrictive limitation on Plaintiff in November, 1999. This failure was significant because there was a lack of objective findings to show that Plaintiff's upper body condition worsened between 1997 and 1999. (R. at 17.) As a result, the ALJ gave greater weight to the medical opinions showing that Plaintiff had some limitations in his ability to lift, carry, push, and pull, but not a complete inability to perform them. (R. at 17.)

Regarding Plaintiff's hand injury, the ALJ found no medical evidence in the record to support Plaintiff's claims that: 1) he experiences a sharp pain in his left hand when he uses his hand and arm, which Plaintiff attributes to arthritis; 2) Plaintiff's bones in his left hand and wrist rub together since his surgeries

in the 1970's and 1990's; and 3) the use of this hand will hasten the need for fusion secondary to deterioration. (R. at 18.)

The ALJ noted that Dr. Toh's examination revealed that Plaintiff had full range of motion of all joints, an ability to make a fist with both hands, 5/5 grip strength, normal dexterity of both hands, and no evidence of atrophy of the left upper extremity. (R. at 18.) There were no objective findings in Dr. Toh's report or other medical evidence to support the degree of left hand impairment alleged by Plaintiff. (R. at 18.) Also, there was no evidence in the record that Plaintiff was told by a physician that using his hand would cause deterioration or a need for fusion. (R. at 18.) The ALJ further found that Plaintiff's own description of his daily activities, which included performing several household chores, belied Plaintiff's claim of left hand pain. (R. at 18.) The ALJ concluded that, even though Plaintiff claims that he sometimes "pays for" the exertion later on, the pain was not of such a severity that it prevented Plaintiff from performing these activities in the first place. (R. at 18.) Noting that Plaintiff was not prescribed medication, the ALJ reasoned that, if Plaintiff did not have sufficient symptom relief with over-the-counter medication, he would have reported this to his treating physician. (R. at 18.) The ALJ further found Plaintiff's testimony that he experiences post-

exertion disorientation incredible because Plaintiff had not sought treatment for the condition. (R. at 18.)

The ALJ noted that Plaintiff acknowledged that he could lift/carry 25 pounds frequently and 50 pounds occasionally; stand/walk 6 hours in an 8 hour day; sit 6 hours in an 8 hour day; and push/pull 50 pounds with his upper extremities. (R. at 18.) These findings refuted Plaintiff's claim of continuing disability. (R. at 18.) The ALJ found that, by Plaintiff's own admission, he is capable of performing the exertional requirement for medium work. (R. at 18.)

The ALJ then determined that the Plaintiff had the RFC to perform the full range of medium work. (R. at 19.) However, since Plaintiff's past relevant work as a delivery helper and water pipe cleaner required the capacity for heavy work, Plaintiff was unable to return to his past relevant work. (R. at 19.) Using the Medical-Vocational Guidelines, the ALJ found that, given Plaintiff's age, high school education, and lack of transferable skills, the Plaintiff can no longer be found disabled. (R. at 19.) The ALJ concluded that the Plaintiff was no longer disable as of January, 1998. (R. at 19.)

## Standard of Review

In reviewing the ALJ's decision, the Court may not decide on the facts, reweigh the evidence, or substitute its own judgment for that of the ALJ. *Herron v. Shalala,* 19 F.3d 329, 333 (7th

17

Cir. 1994). Where conflicting evidence allows reasonable minds
to differ, the responsibility for determining whether a claimant
is disabled falls upon the Commissioner, not the courts. *Herr v.
Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990); *see also Stuckey v.
Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989) (the ALJ has the
authority to assess medical evidence and give greater weight to
that which he finds more credible). Rather, the Court must
accept findings of fact that are supported by "substantial
evidence," 42 U.S.C. § 405(g), where substantial evidence is
"such relevant evidence as a reasonable mind might accept as
adequate to support a conclusion." *Herron*, 19 F.3d at 333
(quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

The Court is limited to determining whether the
Commissioner's final decision is supported by substantial
evidence and based upon proper legal criteria. *Ehrhart v. Sec'y
of Health and Human Servs.*, 969 F.2d 534, 538 (7th Cir. 1992).
This does not mean that the ALJ is entitled to unlimited judicial
deference, however. The ALJ must consider all relevant evidence
and may not select and discuss only that evidence that favors his
ultimate conclusion. *Herron*, 19 F.3d at 333. In addition to
relying on substantial evidence, the ALJ must articulate his
analysis at some minimal level. *See Young v. Sec'y of Health and
Human Servs.*, 957 F.2d 386, 393 (7th Cir. 1992) (ALJ must
articulate his reason for rejecting evidence "within reasonable

limits" in order for meaningful appellate review). The ALJ must build "an accurate and logical bridge" from the evidence to his conclusion. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

Finally, although Plaintiff bears the burden of demonstrating his disability, "[i]t is a basic obligation of the ALJ to develop a full and fair record." *Thompson v. Sullivan*, 933 F.2d 581, 585 (7th Cir. 1991) (*quoting Smith v. Sec'y of HEW*, 587 F.2d 857, 860 (7th Cir. 1978)). "Failure to fulfill this obligation is 'good cause' to remand for gathering additional evidence." *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000) (finding that, if the ALJ found the evidence before him insufficient, he should have obtained more evidence.)

### Social Security Regulations

The Social Security Regulations prescribe a sequential five-part test for determining whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520 and 416.920 (2001). The ALJ must consider: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude gainful activity; (4) whether the claimant is unable to perform his past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers

19

in the national economy. *See* 20 C.F.R. §§ 404.1520 and 416.920; *see also Young*, 957 F.2d at 389. A finding of disability requires an affirmative answer at either step 3 or step 5. A negative answer at any step (other than step 3) precludes a finding of disability. *Id.* The claimant bears the burden of proof at steps 1-4, after which the burden shifts to the Commissioner at step 5. *Id.*

The ALJ's analysis at step 5 typically involves an evaluation of the claimant's RFC to perform a particular category of work (i.e. sedentary, light, medium, heavy, or very heavy work), in combination with an application of the Medical-Vocational Guidelines ("the Grid") to determine whether an individual of the claimant's age, education, and work experience could engage in substantial gainful activity. *See* 20 C.F.R. Part 404, Subpart P, Appendix 2. The Grid is a chart that classifies a claimant as disabled or not disabled, based on the claimant's physical capacity, age, education, and work experience. *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987). If the use of the Grid is appropriate, the Commissioner or ALJ may rely upon it for determining disability, and, in such as case, the Grid alone constitutes substantial evidence sufficient to uphold the decision of the Commissioner. *Id.*

Another regulation applies, however, when attempting to determine whether a disability continues or ceases for an

individual who has previously been found disabled.  *See* 20 C.F.R. § 416.994 (b) (2001).  The factors considered in determining whether a disability continues are: (1) whether there has been any medical improvement in the impairment; (2) if there has been medical improvement, if the improvement is related to the ability to work; and (3) whether or not claimant is able to engage in substantial gainful activity.  20 C.F.R. § 416.994.

This section provides that, except in specific situations, a claimant's disability will be found to have ceased only if: (1) there has been medical improvement or (2) one of the exceptions to medical improvement applies and the claimant is currently able to engage in substantial gainful activity.  20 C.F.R. § 416.994. In cases where medical improvement has occurred and the severity of the prior impairment no longer meets or equals a listing, the medical improvement will be considered related to the ability to work.  20 C.F.R. § 416.994 (b)(2)(iv)(A).

Once the ALJ determines that there is medical improvement related to the ability to work, he must determine whether the individual can engage in substantial gainful activity by determining: (1) if the claimant can engage in past relevant work or (2) if the individual can engage in other work, given the RFC assessment and considering age, education, and past work experience.  20 C.F.R. § 416.994 (b)(5)(vi-vii).

## DISCUSSION

In reviewing Plaintiff's claim, the ALJ found in favor of Plaintiff at steps one and two of the sequential evaluation, finding that Plaintiff was not engaged in substantial gainful activity (R. at 16) and that he had a severe impairment that imposes more than a minimal limitation on his ability to work (R. at 17.) At step three, the ALJ found that Plaintiff's cancer had not returned since 1992 and, therefore, his impairment no longer meets the criteria of Listing 13.02E. (R. at 17.) Moving on to step four, the ALJ determined that Plaintiff is not capable of performing any past relevant work. (R. at 19.)

This necessitated that the ALJ proceed to step five, where the burden shifted to the Commissioner to establish that Plaintiff is able to perform other work existing in significant numbers in the national economy. *See* 20 C.F.R. §§ 404.1520 and 416.920 (2001). In determining that the Plaintiff could engage in substantial gainful activity, the ALJ found Plaintiff has the residual functional capacity ("RFC") to perform the full range of medium work[3]. (R. at 19.) Considering Plaintiff's age, high school education, and vocational profile, the ALJ determined that Plaintiff was no longer disabled. (R. at 19.)

---

[3] The Commissioner argues that, even if Plaintiff's ability to lift were less than that found by the ALJ, he would still be found not disabled because the result would be the same if the guidelines for light work were applied pursuant to § 202.21. (Def's Mem. for S. J. at p. 11, n.2.)

Plaintiff contends that the ALJ: 1) failed to meet his heightened duty to an unrepresented Plaintiff; 2) the ALJ discounted the reports of Plaintiff's treating physicians demonstrating that he was limited in his ability to push, pull, lift and carry; 3) failed to develop the record pertaining to Plaintiff's left upper extremity surgical procedures; and 4) failed to fully and fairly develop the record regarding the mental aspect of Plaintiff's claim. Having carefully reviewed the entire record upon which the ALJ based his decision, the Court concludes that the ALJ's conclusion is supported by substantial evidence in the record as a whole.

## A. The ALJ Met His Heightened Duty To Unrepresented Plaintiff.

In his first argument, Plaintiff asserts that the ALJ failed to meet his heightened duty to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts" to develop the record because Plaintiff was unrepresented. Plaintiff's Memorandum in Support of Plaintiff's Motion for Summary Judgement ("Pl.'s Mem. Supp. Summ. J.") at 7. Plaintiff contends that the ALJ failed to meet this heightened duty because, when Plaintiff testified that he was limited in what he could do and he becomes disorientated after exertion, the ALJ never asked Plaintiff how long it takes his sensibilities to return. (Pl.'s Mem. Supp. Summ. J. at 8.) Plaintiff further contends that the ALJ did not conscientiously inquire about

23

whether Plaintiff would be able to sustain the exertion of lifting and carrying 20 to 30 pounds. (*Id.*)

Plaintiff's contentions are without merit. Although the ALJ never asked Plaintiff how long it takes to recover after exertion, there was abundant evidence in the record on this matter. For example, on July 21, 1999, Plaintiff told disability officer Varma, that "sometimes I can do the normal chores and I won't have the aftermath. But then at other times it will take me two days to recover. I can't predict it." (R. at 213.) Also, in his August 22, 1997 continuing disability interview and his October 1, 1997 disability report, Plaintiff stated that disorientation was only brought on by strenuous activity or heavier than normal lifting, and that sometimes the disorientation lasted for several days. (R. at 137, 147.)

The ALJ conscientiously inquired about whether Plaintiff would be able to sustain the level of exertion of lifting and carrying 20 to 30 pounds. When the ALJ attempted to summarize Plaintiff's testimony at the hearing, he asked Plaintiff if he could occasionally lift 50 pounds, frequently lift 25 pounds, could stand or walk for six hours in an eight hour day, sit for six hours in an eight hours day and push or pull about 50 pounds. (R. at 45-46.) Plaintiff agreed that this was a fair and accurate description of his abilities. (R. at 46.) This line of

questioning shows that the ALJ did conscientiously inquire into the Plaintiff's ability to sustain a level of exertion.

The Court concludes that the record was sufficient to provide the ALJ with an understanding of Plaintiff's alleged disability and the time Plaintiff required to recover after exertion.

**B.    The ALJ Did Not Discount The Reports Of Plaintiff's Treating Physicians But Gave Greater Weight To the Reports He Found More Credible.**

Plaintiff next argues that the ALJ improperly discounted the reports of Plaintiff's treating physicians that he was limited in his ability to push, pull, lift, and carry. (Pl.'s Mem. Supp. Summ. J. at 8.) Specifically, Plaintiff claims that the ALJ improperly rejected Dr. Mason's 1999 report, which concluded that Plaintiff was unable to perform activities requiring use of Plaintiff's upper body, upper arms and shoulder muscles.

The ALJ acknowledged Dr. Mason's 1999 report, but found it inconsistent with Dr. Mason's 1997 report and Dr. Petchenik's 1993 report, which found that Plaintiff was merely limited, but not unable to perform activities requiring use of the upper body. Because Dr. Mason did not explain why or how the Plaintiff's condition had deteriorated since 1997, the ALJ relied upon Dr. Mason's 1997 report and Dr. Petchenik's 1993 report to support his conclusion that Plaintiff's upper body, upper arm, and shoulder strength was merely limited.

25

A treating physician's[4] opinion regarding a medical condition is entitled to controlling weight if it is well supported by medical evidence and not inconsistent with other substantial evidence in the record. *Zurawski v. Halter*, 245 F. 3d 881, 889 (7th Cir. 2001.) However, the Seventh Circuit has also stated that the ALJ has the authority to assess medical evidence and give greater weight to that which he finds more credible. *Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989).

In this case, the ALJ assessed all of the medical evidence that had been admitted into the record and assessed their reliability and persuasiveness. Upon reviewing the medical reports, the ALJ determined that Dr. Mason's November 1999 report, which tended to support Plaintiff's claim of disability, was less influential than conflicting reports because: (1) the other reports concluded that Plaintiff was only limited in his use of these muscles, (2) Dr. Mason's 1999 report conflicted with his 1997 report, which stated that Plaintiff was only limited in these areas, and (3) Dr. Mason did not explain why Plaintiff's impairments had become more severe. (R. at 17.)

The ALJ acknowledged that, even though Plaintiff did not have an impairment of listing level severity, Plaintiff did

---

[4] Plaintiff's treating physicians were Dr. Petchenik and Dr. Mason. Dr. Toh examined Plaintiff at the request of the SSA.

suffer from a severe impairment which imposes more than a minimal limitation on his ability to work. (R. at 17.) The ALJ found that objective evidence indicated that Plaintiff's neck dissection had caused reduced strength and dexterity in his upper body and arm, which limited his ability to lift, carry, push, and pull. (R. at 17.)

Initially, the Court notes that neither the ALJ nor the parties reference Dr. Mason's 1998 neoplasm report and medical questionnaire for the Bureau of Disability Determination Services, which also opined that Plaintiff was unable to perform activities using the muscles of his upper body, upper arms, and shoulders. Moreover, this Court finds that, given the apparent inconsistency between Dr. Mason's 1997 and 1999 assessment of Plaintiff's capabilities, the best course of action would have been for the ALJ to contact Dr. Mason for an explanation regarding the two diagnoses.

Nevertheless, the Court finds that, given Plaintiff's own testimony, the ALJ's decision to discount Dr. Mason's November 1999 report was entirely appropriate. Although Dr. Mason believed that Plaintiff was unable to perform activities using the muscles of his upper body, upper arms, and shoulders, Plaintiff testified that he could lift 50 pounds occasionally, 25 pounds frequently, and push and pull 50 pounds. Plaintiff admitted that he performs household chores on a daily basis that

require use of those muscles, including polishing cabinets, washing windows, vacuuming, painting, lawn work, and grocery shopping.

Because Plaintiff's testimony contradicts Dr. Mason's opinion that Plaintiff is unable to perform activities using his upper arm, upper body, and shoulder muscles, the Court finds that the ALJ's failure to make further inquiries of Dr. Mason did not constitute reversible error. The ALJ's conclusion that Plaintiff was merely limited and not unable to rely upon his upper body, upper arm and shoulder muscles is supported by substantial evidence.

### C. The ALJ's Failure To Obtain Medical Records Regarding Plaintiff's Hand Surgeries Did Not Constitute Failure To Fairly Develop The Record.

Plaintiff also contends that the ALJ's failure to obtain the records pertaining to Plaintiff's left upper extremity surgical procedures constitutes reversible error. (Pl.'s Mem. Supp. Summ. J. at 10.) The Court disagrees.

The ALJ must obtain additional evidence if the evidence before him is insufficient to determine whether the Plaintiff is disabled or if he cannot reach a conclusion about disability after weighing the conflicting evidence. 20 C.F.R. § 404.1527 (c)(3), 20 C.F.R. § 416.927 (c)(3). Furthermore, the Seventh Circuit has stated that there must be a significant omission before the court will find that the ALJ failed to assist a *pro se*

Plaintiff in fully and fairly developing the record. *Luna v. Shalala*, 22 F.3d 687, 692 (7th Cir. 1994) (affirming decision even though the ALJ did not obtain other medical evidence, where the ALJ questioned claimant about his pain, medication and activities and reviewed other medical records.)

The Court finds that the ALJ's failure to obtain records from the Plaintiff's prior hand surgeries did not constitute a significant omission. Rather, the evidence in the record enabled the ALJ to reach a conclusion regarding the status of Plaintiff's condition.

The ALJ noted Plaintiff's testimony regarding his surgeries in the 1970's and 1990's. Notwithstanding Plaintiff's testimony about pain and limitations in his left hand, Plaintiff was not prescribed any medications for pain, and had good use of his hand. (R. at 36-40, 179-182.) In addition, Plaintiff had not been treated for this pain from September 9, 1994 through the February 10, 2000 hearing, except for an examination by Dr. Toh, an internist, at the request of the SSA.[5] Dr. Toh's December 2, 1997 report found that Plaintiff had full range of motion of all joints, an ability to make a fist with both hands, 5/5 grip

---

[5] Plaintiff did not lose his medicaid insurance until January, 1998 and, therefore, the argument that he was unable to afford medical treatment is without merit. However, the ALJ did not discuss this argument.

strength, normal dexterity of both hands, and no evidence of atrophy of the left upper extremity. (R. at 18.)

The ALJ found that Dr. Toh's December 2, 1997 report contradicted Plaintiff's claim regarding pain in his hands. The ALJ further found that Plaintiff's admission that he performs all of his own household chores, including painting and lawn work, undermined Plaintiff's claims of pain. (R. at 18.) The ALJ concluded that, even though Plaintiff claims that he "pays for" the exertion later on, the pain was not of such a severity that it prevented Plaintiff from performing these activities in the first place. (R. at 18.)

Given that Plaintiff's left hand pain was 1) not so severe as to warrant medication or even mentioning it to a physician; or 2) not so limiting as to prevent Plaintiff from undertaking housework, the 1978 and 1993 records of Plaintiff's hand surgeries would not have helped the ALJ in making his determination. In these circumstances, the ALJ's failure to obtain the 1978 and 1993 records regarding the hand surgery was not a significant omission and, therefore, did not constitute failure to fairly develop the record.

### D. The ALJ Did Not Fail To Develop The Record Regarding Plaintiff's Mental Impairments.

Finally, Plaintiff asserts that the ALJ failed to fully and fairly develop the record regarding Plaintiff's mental

impairments.  (Pl.'s Mem. Supp. S. J. at 10.)  Plaintiff contends
that there were several red flags raised regarding his mental
condition, and that the ALJ should have pursued the matter.
(Pl.'s Mem. Supp. S. J. at 10.)  Plaintiff cites to two Social
Security agents' comments regarding Plaintiff's mental state,
which Plaintiff claims indicate that he had a mental impairment.
(Pl.'s Mem. Supp. S. J. at 10.)  On August 23, 1997, Agent Keane
reported that Plaintiff appeared to be very nervous.  (R. at 140-
141.)  Similarly, on July 21, 1999, Agent Varma reported that
Plaintiff appeared to be nervous and depressed about his
condition.  (R. at 220.)  The Plaintiff also cites to Dr. Toh's
report, which finds that Plaintiff had a flat affect and not much
emotional expression.  (Pl.'s Mem. Supp. S. J. at 11.)  Plaintiff
ignores Dr. Toh's further finding that Plaintiff had no sign of a
depressive disorder.

The ALJ is required to obtain additional evidence only if
the evidence before him is insufficient to determine whether the
Plaintiff is disabled, or if the evidence is conflicting.    20
C.F.R. § 404.1527 (c)(3), 20 C.F.R. § 416.927 (c)(3).  However,
in this case, Plaintiff never claimed to be depressed, or to be
suffering from a mental impairment.  The Court finds that the
Plaintiff's attempt to create a duty for ALJs to explore the
possibility of a mental impairment -- triggered only by the
passing remarks of non-mental health professionals - goes too

far.  The Seventh Circuit has stated that "[s]evere depression is

not the blues.  It is a mental illness; and health professionals,

in particular psychiatrists, not lawyers or judges, are the

experts on it."  *Wilder v. Chater*, 64 F.3d 335, 337 (7th Cir.

1995).  In this situation, the statements by two non-mental

health professionals that Plaintiff seemed depressed or nervous

was a <u>casual</u> use of the term "depression", which the ALJ properly

discounted when not pursuing the matter further.[6]

Although the Commissioner has the burden of proving that

Plaintiff can perform work existing in large numbers in the

economy, it was Plaintiff's obligation to bring to the ALJ's

attention any condition that tended to show he was disabled.  *See*

20 C.F.R. § 404.1512(a).  Section 404.1512(a) states that the

Commissioner will consider only impairments that Plaintiff says

he has, or which they receive evidence about.  In this situation,

Plaintiff never mentioned having a mental impairment and no

competent evidence regarding a mental impairment was received by

---

[6] The Seventh Circuit has reasoned that the diagnosis and
treatment of depression, the mental illness, differs
substantially from "depression" the common mental state and has
found that an ALJ is entitled to discount the casual use of that
term.  *Loveless v. Chater*, 1996 WL 530998, *1 (7th Cir. Sept. 16,
1996) (affirming decision when the ALJ discounted notations that
claimant appeared depressed from physicians attending to
claimant's back problems because ALJ was entitled to discount
casual use of the term "depressed" in finding claimant not
disabled by depression.)   Although this decision is not
published and, therefore, without precedential value, the Court
finds the reasoning expressed therein to be persuasive.

the Commissioner.  Therefore, Plaintiff's alleged mental condition was never properly before the ALJ.

The Court finds that statements by non-mental health practitioners regarding Plaintiff being "depressed", did not raise the issue of a possible mental impairment that would have obligated the ALJ to develop that issue.

## CONCLUSION

Having carefully reviewed the entire record, and for the reasons set forth above, the Court finds that the Commissioner's (here the ALJ's) conclusion that Plaintiff's disability ceased as of January, 1998 is supported by substantial evidence in the record as a whole.

Accordingly, IT IS HEREBY ORDERED that the Commissioner's Motion for Summary Judgment be, and the same hereby is, GRANTED.

IT IS FURTHER ORDERED that Plaintiff's Motion for Summary Judgment be, and the same hereby is, DENIED.


DATED: *December 20, 2001*

Enter:

ARLANDER KEYS
United States Magistrate Judge